No. 11-35558

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

### DAVID K. DEMERS
*Plaintiff – Appellant,*

vs.

### ERICA AUSTIN, ERICH LEAR, WARWICK M. BAYLY AND FRANCES McSWEENEY
*Defendants – Appellees*

---

*On Appeal from the United States District Court,*
*Eastern District of Washington (Spokane) No. 2:09-cv-00334-RHW*
*Honorable Robert H. Whaley*

---

### OPENING BRIEF OF APPELLANT
### DAVID K. DEMERS

---

### GRAHAM & DUNN PC
### Judith A. Endejan
### WSBA # 11016
### 2801 Alaskan Way ~ Suite 300
### Seattle, Washington 98121
### (206) 624-8300

*Attorneys for Plaintiff – Appellant*
**David K. Demers**

## **TABLE OF CONTENTS**

**PAGE(S)**

**TABLE OF CONTENTS** .................................................................i-iii

**TABLE OF AUTHORITIES** ........................................................iv-vii

I.    **JURISDICTIONAL STATEMENT** ......................................................1

II.   **ISSUES PRESENTED FOR REVIEW** ...................................................1

III.  **STATEMENT OF THE CASE** ......................................................3

IV.  **STATEMENT OF FACTS** ........................................................4

    A.  **DR. DEMERS WAS A SUCCESSFUL, WELL-REGARDED PROFESSOR AT MURROW UNTIL DR. AUSTIN BECAME INTERIM DIRECTOR IN 2006**........................................................5

    B.  **DR. DEMERS RUNS AN OUTSIDE PUBLISHING BUSINESS, MARQUETTE BOOKS WITH WSU'S KNOWLEDGE AND APPROVAL**...................................................7

    C.  **DR. DEMERS, AS PUBLISHER OF MARQUETTE BOOKS, INDEPENDENTLY DEVELOPED THE 7-Step Plan TO IMPROVE THE QUALITY OF MURROW** ......8

    D.  **DR. AUSTIN PROVIDED DECLINING, NEGATIVE ANNUAL REVIEWS OF DR. DEMERS AND REQUESTED AN UNWARRANTED AUDIT** ........................................... 11

        1.  **Dr. Demers Received the Lowest Evaluation of Murrow Faculty for 2006**........................................................ 11

        2.  **Dr. Austin Continued to Claim Dr. Demers Cancelled Classes in the 2007 Review** ........................................ 14

i

    **3. Dr. Austin Continued a Downward Spiral of Evaluations by Giving Dr. Demers a Rating of 2.05 for Calendar Year 2008** ..... 15

    **4. Drs. Austin and McSweeney Commenced an Internal Audit Investigation of Dr. Demers** ........................................................ 17

    **5. The Defendants' Conduct Punishes Dr. Demers for the *7-Step Plan* and *The Ivory Tower of Babel*** ................................. 20

**V. SUMMARY OF ARGUMENT** ............................................................. 21

**VI. ARGUMENT** ......................................................................................... 24

    **A. STANDARD OF REVIEW** ............................................................. 24

    **B. THE DISTRICT COURT ERRED BY CONCLUDING THE *7-Step Plan* AND *The Ivory Tower of Babel* DID NOT ADDRESS A MATTER OF PUBLIC CONCERN** .................... 24

        **1. The District Court Erred by Finding the *7-Step Plan* Did Not Address a Matter of Public Concern** ............................................. 25

        **2. The District Court Erred by Finding That *The Ivory Tower of Babel* Did Not Address a Matter of Public Concern** .............. 31

    **C. THE DISTRICT COURT ERRED IN FINDING THAT THE *7-Step Plan* AND *The Ivory Tower of Babel* WAS UNPROTECTED EMPLOYEE SPEECH** ................................................ 33

        **1. Even Under *Garcetti* the *7-Step Plan* Does not Qualify as "Official Duties" Speech** ................................................................ 33

        **2. The District Court Erred by Applying *Garcetti* to the *7-Step Plan*; by Deferring to the Defendants' Definition as to the Scope and Content of Dr. Demers' Job Responsibilities and by Ignoring Evidence that Showed that the *7-Step Plan* was Not Part of Dr. Demers' "Official Duties"** ................................................. 34

    **D. THE DISTRICT COURT ERRED BY CONCLUDING THAT *The Ivory Tower of Babel* WAS UNPROTECTED SPEECH** ..... 43

ii

**E. THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY** ...................................................................... 44

**VII. CONCLUSION** .......................................................................... 47

**STATEMENT OF RELATED CASES** ........................................... 48

**CERTIFICATE OF COMPLIANCE** ............................................. 49

**CERTIFICATE OF SERVICE** ...................................................... 50

## TABLE OF CASES AND OTHER AUTHORITIES

**CASES**                                                                         **PAGE(S)**

*Adams v. The Trustees of the Univ. of N.C.*
640 F.3d 550, 565 (4th Cir. 2011) ................................ 33,36,37,38,45

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 255 (1986) ................................................................. 24

*Anthoine v. North Central Counties Consortium*
605 F.3d 740, 749-50 (9th Cir. 2010) ............................................. 30

*Bernheim v. Litt*
79 F.3d 318, 325 (2d Cir. 1996) ...................................................... 28

*Berry v. Dep't of Soc. Servs.*
447 F.3d 642, 648 (9th Cir. 2006) ................................................... 25

*Blankenhorn v. City of Orange*
485 F.3d 463, 470 (9th Cir. 2007) ................................................... 24

*Brammer-Hoelter v. Twin Peaks Charter Academy*
492 F.3d 1192, 1206 (10th Cir. 2007) ............................................. 28

*City of San Diego v. Roe*
543 U.S. 77, 83-84 (2004) .............................................................. 30

*Clairmont v. Sound Mental Health*
632 F.3d 1091, 1103 (9th Cir. 2011) ........................................... 26,45

*Clark v. Whiting*
607 F.2d 634, 638-39 (4th Cir. 1979) ............................................. 41

*Connick v. Myers*
461 U.S. 138, 146 (1983) ............................................................ 26,29

*Desrochers v. City of San Bernardino*
572 F.3d 703, 709-10 (9th Cir. 2009) ......................................... 26,30,33

**CASES [continued]**                                               **PAGE(S)**

*Dube v. State Univ. of N.Y.*
900 F.2d 587, 597-98 (2d Cir. 1990), cert denied, 501 U.S. 1211 (1991) . 41,42

*Eng v. Cooley*
552 F.3d 1062, 1070 (9th Cir. 2009) ..................................................... 23,25,26

*Evans-Marshall v. Bd. of Educ. of The Tipp City Exempted Village Sch. Dist.*
428 F.3d 223, 231 (6th Cir. 2005) ................................................................ 28

*Freitag v. Ayers*
468 F.3d 528, 546 (9th Cir. 2006) ................................................................ 40

*Garcetti v. Ceballos*
547 U.S. 410 (2006)....................................................................................passim

*Grutter v. Bollinger*
539 U.S. 306, 329 (2003).......................................................................... 38,44

*Hong v. Grant*
516 F.Supp.2d 1158, 1166 (C.D. Cal. 2007) ............................................. 42

*Hong v. Grant*
403 Fed.Appx. 236, 237 (9th Cir. 2010)..................................................... 45

*Huppert v. City of Pittsburgh*
574 F.3d 696, 702 (9th Cir. 2009) ........................................................... 24,35

*Johnsen v. Independent School Dist. No. 3*
891 F.2d 1485, 1490 (10th Cir. 1989) ......................................................... 28

*Johnson v. Multnomah Cnty. Or.*
48 F.3d 420, 422, cert.denied, 515 U.S. 1161 (1995)................................ 26

*Kelly v. Huntington Union Fee School*
675 F.Supp.2d 283, 294 (E.D.N.Y. 2009) ................................................. 28

*Keyshian v. Bd. of Regents of the Univ. of N.Y.*
385 U.S. 589, 603 (1967).............................................................................. 32

v

**CASES [continued]**                                        **PAGE(S)**

*Las Vegas Sands LLC v. Nehme*
   632 F.3d 526, 532 (9th Cir. 2011) ...................................................... 24

*Leuthje v. Peavine School Dist.*
   872 F.2d 352, 355 (10th Cir. 1989) .................................................. 28

*Morfin v. Albuquerque Pub.Sch.*
   906 F.2d 1434, 1438 (N.M. 1990) ................................................... 28

*Nichols v. Dancer*
   657 F.3d 929, 934 (9th Cir. 2011) .................................................. 35

*Pickering v. Bd. of Edu.*
   391 U.S. 563, 568 (1968).......................................................... 25,28,29

*Posey v. Lake Pond Oreille Sch. Dist. No. 84*
   546 F.3d 1121, 1126 (9th Cir. 2008) ....................................... 24,34,35

*Rankin v. Independent School Dist. No. I-3*
   876 F.2d 838, 843 (10th Cir 1989) .................................................. 28

*Robinson v. York*
   566, F.3d 817, 824 (9th Cir. 2009), cert. denied,
   130 S.Ct. 1047 (2010)........................................................... 35,36,45

*Sadid v. Idaho State University*
   265 P.3d 1144, 1152 (Idaho 2011) ................................................. 28

*Settlegood v. Portland Pub. Sch.*
   371 F.3d 503, 514, cert. denied, 543 U.S. 979 (2004)...................................... 29

*Spiegla v. Hull*
   371 F.3d 928, 936 (7th Cir. 2004) .................................................. 30

*Sweezy v. State of N.H.*
   354 U.S. 234, 240 (1957)............................................................... 44

**CASES [continued]**        **PAGE(S)**

*Ulrich v. City and County of S.F.*
   109 F.3d 578, 586 (9th Cir. 1997) ...................................................................26

**STATUTES**

28 U.S.C. §1291 ...................................................................................................1

28 U.S.C. §1331 ...................................................................................................1

28 U.S.C. §2343 ...................................................................................................1

42 U.S.C. § 1983 ..................................................................................................1

42 U.S.C. § 1988 ..................................................................................................1

FRCP 56(c) .........................................................................................................24

## I.    JURISDICTIONAL STATEMENT

The district court had original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 2343 because the Amended Complaint raises federal questions under the First Amendment, U.S. Const. amend. I.  The district court had authority to award damages and injunctive relief under 42 U.S.C. § 1983 and costs and attorneys' fees under 42 U.S.C. § 1988.  This Court has subject matter jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

Final judgment granting Defendants' Motion for Summary Judgment dismissing Plaintiff/Appellant's First Amendment claims was entered on June 2, 2011.  A Notice of Appeal was timely filed on June 30, 2011.

## II.   ISSUES PRESENTED FOR REVIEW

A.    Does a publicly distributed letter proposing a "*7-Step Plan*"[1] for the improvement of the quality of the communications programs at Washington State University ("WSU") written by Dr. David Demers, a WSU professor, in his private capacity as a publisher, address a matter of public concern protected by the First Amendment?

B.    Does Dr. Demers' book titled *The Ivory Tower of Babel:  An American Odyssey* (2008, 2009 unpublished drafts) that, among other

---

[1] The full title is "*A 7-Step Plan for Making the Edward R. Murrow School of Communication Financially Independent.*"  (ER 696-704.)

things, criticizes WSU for failing to embrace and uphold the ideals of the Age of Enlightenment, address a matter of public concern protected by the First Amendment?

C.   Did Dr. Demers, in publishing the *7-Step Plan,* speak as a public employee or a private citizen when he (1) signed the plan in his private capacity; (2) was not asked to write the *7-Step Plan* by WSU; (3) did not write the *7-Step Plan* as part of his official job duties; (4) was not paid to write the *7-Step Plan;* (5) used no WSU resources to write or distribute publicly the *7-Step Plan* and (6) volunteered $50,000 and $100,000 of his personal funds to implement the *7-Step Plan?*

D.   Does Dr. Demers lose First Amendment protection for *The Ivory Tower of Babel,* which criticizes WSU officials and was written as part of his duties as an academic while in WSU's employment?

E.   Did the district court err by resolving material factual conflicts in the Defendants' favor in granting summary judgment on Dr. Demers' First Amendment claims?

F.   Did the district court err by finding that the individually named Defendants are entitled to qualified immunity?

2

### III. STATEMENT OF THE CASE

Appellant Dr. David K. Demers ("Dr. Demers") filed this First Amendment retaliation case against four WSU administrators, the Defendants, for punishing him for speaking out about improving the quality of journalism education at WSU's Murrow College of Communications ("Murrow") and for criticizing them in a scholarly work. These administrators systematically produced and sustained negative, unwarranted performance evaluations that contained provable falsehoods to manufacture a "record" to rid themselves of an outspoken professor. They subjected Dr. Demers to two unwarranted internal audits, which led to a formal notice of discipline. In sum, over a three-year period Dr. Demers went from being a popular teacher and scholar with high evaluations to a target for termination due to the actions of the Defendants who resented his speech.

Two acts of speech are at issue in this appeal. The first is a letter/report written by Dr. Demers entitled the *7-Step Plan* that he wrote as a private citizen and in which he proposed seven ways to improve the quality of Murrow and sought to generate support for the plan from mass media professionals and businesses. Dr. Demers backed his plan with a significant pledge of his own money. He sent the *7-Step Plan* to top WSU administrators and to the news media in Washington State.

3

The second act of speech is a book he wrote as a professor, titled *The Ivory Tower of Babel* that was critical of WSU administration, among other things.

After discovery, the Defendants moved for summary judgment. The district court granted it on the basis that the two acts of speech were not protected under the First Amendment because they did not involve matters of public concern and were written as part of Dr. Demers' official duties. The district court then ruled that the foregoing findings entitled the Defendants to qualified immunity.

In reaching its ruling, the district court misapplied *Garcetti v. Ceballos*, 547 U.S. 410 (2006)[2] because the Supreme Court explicitly reserved the question of whether the limits to the free speech rights of public employees applied to university professors. First, the district court converted an act of private speech, the *7-Step Plan*, into speech made as part of Dr. Demers' "official duties" by ignoring substantial evidence that the plan met none of the criteria for "official" speech under *Garcetti*. Second, it applied *Garcetti* to academic speech rendered as part of a professor's academic duties in disregard for the carve-out for such speech in *Garcetti*.

---

[2] In *Garcetti*, the Supreme Court held that public employees do not have First Amendment protection for statements made pursuant to their official duties.

Dr. Demers seeks a reversal of the district court's ruling that his speech in not protected under the First Amendment and that the Defendants are entitled to qualified immunity.

## IV. STATEMENT OF FACTS

## A. DR. DEMERS WAS A SUCCESSFUL, WELL-REGARDED PROFESSOR AT MURROW UNTIL DR. AUSTIN BECAME INTERIM DIRECTOR IN 2006

Dr. Demers is an Associate Professor in the Edward R. Murrow College of Communications at WSU.[3] He started teaching at WSU in 1996. He is a media sociologist who obtained tenure in 1999. (ER 856) Until 2006, Dr. Demers served under Director Alex Tan, who gave Dr. Demers high ratings in Dr. Demers' annual reviews for almost a decade (ER 769-795). For instance, in Dr. Demers' 2005 annual review, Dr. Tan said "Professor Demers has established a national reputation as a mass communications scholar with a focus on media and structure … Dave is a creative and innovative writer – with new and intriguing ideas. All in all, his books contribute significantly to the mass media literature…. His student evaluations for the large lecture Mass Media and Society course average 4.43, the highest for classes 150 or more in the school. Considering class enrollments, Dave has one of the heaviest teaching loads in the school … Dave served the school on

---

[33] The Murrow College became an independent college in summer 2008 (ER 856). Prior to that time, it was a school housed in the WSU College of Liberal Arts (ER 713).

important committees such as the graduate studies committee and a search committee." (ER 771.)

In 2006, Dr. Erich Lear, Dean of the College of Liberal Arts, which housed Murrow at the time, decided to not reappoint Dr. Tan as Director (ER 87-96, 606). Instead, he named Dr. Erica Austin ("Dr. Austin") as Interim Director (ER 634). The decision to oust Dr. Tan was controversial among Murrow faculty and Dr. Demers was an outspoken supporter of Dr. Tan (ER 606, 634).

Dr. Austin was never a big fan of Dr. Demers. While Dr. Austin had supported Dr. Demers' promotion to tenure in May of 1998, she expressed concerns about his controversial ideas and speech:

> "His ideas are somewhat controversial in some circles, but his work is of high enough quality to withstand such attacks … I have received complaints from other members of his sequence (all untenured) about his lack of willingness to be a 'team player.' I do not know whether this is his doing, their doing or the result of outside influences but it does concern me … His tendency to invite and attract controversy can be unsettling." (ER 597.)

Early in Dr. Austin's tenure as Interim Director, she became aware of the *7-Step Plan* through sources outside of Murrow in early 2007 and she was frustrated by it (ER 204-212). During this time period, Dr. Demers challenged her authority, protesting her threat to punish the author of an anonymous letter that was critical of her and her claims that Murrow had a policy on class cancellations (ER 937, 806-812). He vigorously protested the 2006 annual review (ER 796-97) that she gave

him (ER 977-991), again questioning her authority.  Her attitude in 2007 about Dr.

Demers is best captured in an email exchange between Dr. Austin and Dr. Frances

McSweeney, Vice Provost for Faculty Affairs.   On August 13, 2007, Dr.

McSweeney emailed Dr. Austin:

> "On a related topic, did David Demers resign or did I just hallucinate
> that?  If he's still with us we might want to talk about your long-term
> thinking about him."

Dr. Austin replied:

> "Wish your dream were true!"  (ER 528-529.)

Dr. McSweeney testified that based on "an accumulation of experience with

Dr. Demers" she viewed him as a "thorn" in her side (ER 486).

## B.   DR. DEMERS RUNS AN OUTSIDE PUBLISHING BUSINESS, MARQUETTE BOOKS WITH WSU'S KNOWLEDGE AND APPROVAL

As a side private business, Dr. Demers runs a small book publishing

company, Marquette Books that has no connection to WSU.  Marquette Books

publishes academic and trade books and six open access (free) scholarly refereed

journals (ER 607).   WSU policy allows faculty to engage in "Extended

Professional Activities" (ER 927-935) such as Marquette Books.  WSU requires

faculty with "Extended Professional Activities" file an "Annual Report"[4] with the

administration about them, if the faculty member wants to get credit as a service to

---

[4] An example of this Annual Report is ER 588.

the community in annual evaluations, according to advice that Dr. Demers received from a WSU provost in 2004 (ER 990-991). Because Dr. Demers did not claim his association with Marquette Books as a "professional activity" and did not ask for credit or recognition as a service to the community, he did not file Annual Reports with WSU. Both Dr. Tan and Dr. Austin were aware of Dr. Demers' association with Marquette Books (ER 975, 990). Dr. Demers informed Dr. Austin of his continuing association with Marquette Books when he submitted his 2006 faculty annual report (ER 975).

**C.  DR. DEMERS, AS PUBLISHER OF MARQUETTE BOOKS, INDEPENDENTLY DEVELOPED THE *7-Step Plan* TO IMPROVE THE QUALITY OF MURROW**

Before entering academic life, Dr. Demers had been a professional journalist for four years on a full-time basis (ER 608). This experience carried forward with Dr. Demers in his subsequent career as a journalism educator and publisher (ER 608). He developed strong views on the need for, and importance of, quality journalism education in Washington State, particularly WSU, which is the only facility in Washington that includes training for the five major categories of professional mass media: television, radio, print journalism, advertising and public relations (ER 607-609). Dr. Demers believed that Murrow programs have serious deficiencies in quality. The program is not nationally accredited (ER 609). Dr. Demers also was concerned about the problematic relationship between WSU's

8

mass media programs and the professional journalism community in Washington. In late 2006, he developed the *7-Step Plan.* (ER 696-704). In it, he outlined the reasons why he believed that the relationship between the professional journalism community and the mass communication program at Murrow had deteriorated. He laid out seven specific points to address the problem:

(1)   Separate the mass communication program from the communication studies program at WSU – i.e., create two separate units.

(2)   Hire a director of the Edward R. Murrow School of Communication who has a strong professional background.

(3)   Create an Edward R. Murrow Center for Media Research that conducts joint research projects with the professional community.

(4)    Give professionals an active (rather than the current passive) role in the development of the curriculum in the school.

(5)   Give professional faculty a more active role in the development of the undergraduate curriculum for mass communication students.

(6)   Seek national accreditation for the "new" mass communication programs.

(7)   Hire more professional faculty with substantial work experience (ER 700).

9

On January 16, 2007, he sent the *7-Step Plan* to Provost Robert C. Bates along with a personal pledge of $50,000 in unrestricted funds to the university (ER 697) to implement the *7-Step Plan*. He signed the letter as **publisher, Marquette Books LLC** and made it clear that Marquette Books "has no ties with nor does it use any of the resources of Washington State University" (ER 697). He received no response from Provost Bates so he sent the *7-Step Plan* to new president Dr. Elson Floyd on March 29, 2007, increasing his pledge amount to $100,000 (ER 701-704.) He was not asked by anyone within the Murrow administration to write the *7-Step Plan* (ER 609-613). Indeed, Dr. Austin, then interim director, did not know about it (ER 205). He received no compensation for preparing the *7-Step Plan* and used no university time or resources to distribute it (ER 610). He sent the *7-Step Plan* to members of the print and broadcast media in Washington State, to administrators at WSU, to some colleagues and to the Murrow Professional Advisory Board (ER 610, 642). He never submitted the *7-Step Plan* to the Murrow administration or any Murrow committee or to the College of Liberal Arts (ER 207-211, 611-612). Dr. Demers sent his plan straight to the top of the university, circumventing the College of Liberal Arts and Murrow administration, which irked WSU administrators who viewed it as "an end run" around their authority (ER 461). Dr. Lear made Dr. Austin aware of the *7-Step Plan* in approximately March of 2007, prior to Dr. Demers' annual review for 2006 (ER 204).

10

### D. DR. AUSTIN PROVIDED DECLINING NEGATIVE ANNUAL REVIEWS OF DR. DEMERS AND REQUESTED AN UNWARRANTED AUDIT

#### 1. Dr. Demers Received the Lowest Evaluation of Murrow Faculty for 2006

In March of 2007, Dr. Austin gave Dr. Demers his annual review for 2006[5] giving him a rating of 2.7 more than two points below his 2005 rating of 4.8 from Dr. Tan (ER 770, 795-797). It was the lowest rating given to a Murrow professor that year (ER 466). Although the reviews were allegedly the result of a new Faculty Review Committee, Dr. Austin prepared the review and assigned the ultimate rating score (ER 221, 238-239). The review process during the Austin regime was highly subjective (ER 240-265). Dr. Austin contended in 2007 that the rating scale was changed in 2006 from a one-point scale (4.0 to 5.0 in 2005) to a four-point scale (1-5) (ER 796). This is not true. Dr. Tan always used the full five-point scale for merit scores, with one being unsatisfactory and five being outstanding (ER 846-854). Any rating below a "three" indicates substandard performance (ER 850). The review rates each area of a professor's performance: research, teaching and service. In the 2006 review, Dr. Austin minimized Dr. Demers' research noting "he has a book manuscript in progress" (ER 796) when in fact Dr. Demers had told her he had completed a 366-page book, "*History and*

---

[5] Annual reviews affect merit raise increases, promotion and tenure (ER 466, 521).

*Future of Mass Media:  An Integrated Perspective*" (2007), which was refereed and published in 2007 by a reputable publisher (ER 284-285, 464).    Yet Dr. Austin found this scholarly activity "below expectations" with no indication of any standard against which she based her subjective conclusion.  She only said she gave Dr. Demers "some credit for something" for his book (ER 282).

With respect to teaching, she acknowledged that his teaching evaluations were at or above faculty averages of between 4 and 4.8.  Nonetheless, she dropped his teaching score to 2.8 stating:

> "The committee and I are concerned that in 2006 he did not meet his classes 'dead week' and that he has had a class policy of cancelling lab sections on weeks that include a holiday, both of which present an unusual model of significantly reduced in-class contact hours that has created concern amongst school faculty.  When asked by the interim director to make a change for future semesters, Dr. Demers declined to alter this schedule.  Because failure to comply with expectations regarding class contact time may be construed as 'serious and repeated neglect of duty' as set forth in Faculty Manual Dr. Demers' unresponsiveness on this issue is of concern."  (ER 796-797.)

Dr. Demers protested this criticism, explaining that he had cancelled classes only for the largest class he taught, COM 101, for pedagogical reasons (ER 614-615, 982-988).  Dr. Demers had used this practice for several years and had never been criticized for it by Murrow administration (ER 982-988).  Further, he changed this practice after Dr. Austin spoke to him about it in late 2006, even though no WSU policy on "class cancellation" existed that precluded the practice (ER 986-987).  Dr. Austin testified that she knew that Dr. Demers had changed his class schedule

to eliminate class cancellation per her request <u>before she wrote</u> his 2006 annual review (ER 269-271). Nonetheless, she refused to change her false statement in the review about Dr. Demers' declining to change his schedule. In his response, Dr. Demers showed Dr. Austin proof that he had changed the syllabus/schedule for COM 101 for spring semester 2007 to eliminate any class cancellations (ER 815-822), but Dr. Austin declined to change any of the statements in his 2006 annual review.

The 2006 review also criticized Dr. Demers for failing to submit an Annual Report for ""Extended Professional Activities" for his Marquette Books activities. Dr. Demers explained that he had been told by the vice provost for research that he did not need to submit such a form (ER 990-991), but the criticism remained. Dr. Demers went to Dean Lear for correction of the 2006 review. Although Dr. Lear could change erroneous evaluations (ER 98), Dr. Lear refused to do so. WSU has no formal appeal process to correct an erroneous annual review, and WSU administrators have no obligation to do anything but note the faculty member's objection and file it away (ER 483-484). Dr. Demers then asked to meet with Dean Lear and Dr. Austin to correct his review but they refused because Dr. Demers wanted to tape record the meeting so that there would be no question as to what transpired (ER 618).

## 2. Dr. Austin Continued to Claim Dr. Demers Cancelled Classes in the 2007 Review

On March 26, 2008, Dr. Austin gave Dr. Demers his annual review for 2007 lowering his overall rating from 2.7 to 2.5. She noted:

> "The average teaching evaluation scores for his classes were positive, but Dr. Demers repeatedly cancelled classes despite warnings that the level of cancellations was unacceptable. For example, students noted that classes scheduled to meet three times per week in the fall of 2007 consistently met two times per week instead."

(ER 799.)

The review minimally acknowledged publication of the 366-page scholarly, referred book that he had finished in 2006 but had published in 2007, stating only that this "met expectations."[6] Again, Dr. Demers filed a written rebuttal to this review (ER 1002-1005). Dr. Demers told Dr. Austin that he never cancelled classes in 2007. He told her that he held online quizzes during class time on Fridays in some classes scheduled to meet three times a week. The Faculty Handbook counts online quizzes and other outside classroom activities as acceptable student contact hours (ER 299, 303-307, 1002).

Once Dr. Demers established that his class schedules involved no cancellations, the administrators shifted their criticism to his practice of using online quizzes in some classes. However, when pressed, Drs. Austin, McSweeney,

---

[6] Dr. Demers has analyzed his research productivity in comparison with other Marrow faculty and his scholarly output exceeds the vast majority of Murrow professors (ER 628-629).

14

Lear and Bayly gave inconsistent testimony, and could not specify anything wrong with Dr. Demers' practice of using online quizzes (ER 118-119, 299, 303-307, 311, 313, 317, 342-344, 351, 505, 511).  No WSU policy prohibits the use of online quizzes (ER 305).  Dr. Demers specifically asked Dr. Austin about whether he could use them and, if so, how many online quizzes were permissible.  She said "You should give the number of quizzes that correspond to the pedagogical needs of your class." (ER 840-841).  However, Dr. Demers' use of "online quizzes" continued to be falsely characterized as an act of cancelling classes or failing to hold classes in his 2007 and 2008 reviews (799, 802).

Dr. Demers sought the assistance of the WSU Ombudsman Ken Strickmeyer, who arranged a meeting with Drs. Austin and Lear during which Dr. Demers told Dean Lear that he had not cancelled any classes because he conducts online quizzes.  As a result of the meeting, Dr. Austin agreed to issue a "correction" to the 2007 review.  She changed "repeatedly cancelled classes despite warnings" to "repeatedly failed to hold classes despite warnings" (ER 802).

### 3.   <u>Dr. Austin Continued a Downward Spiral of Evaluations by Giving Dr. Demers a Rating of 2.05 for Calendar Year 2008</u>

Dr. Demers was allowed to go on sabbatical for fall semester 2008 after Dr. Austin reviewed his request with WSU attorneys (ER 594-596).  Prior to his leave, Dr. Demers told Dr. Austin that he intended to write a book, *The Ivory Tower of Babel,* portions of which would be critical of the WSU administration, particularly

15

Murrow. He provided sample excerpts of the book and his sabbatical application describes it as:

> "This book asserts that the social sciences have failed to live up to their promises and employs historical, comparative, personal and social scientific methods to support this proposition. The book contains information that is critical of the academy, including some events at Washington State University." (ER 941)

After his return from sabbatical, and writing *The Ivory Tower of Babel,* Dr. Austin gave Dr. Demers his lowest review, rating him at 2.05 (ER 304-305). Both Drs. Austin and McSweeney read unpublished portions of *The Ivory Tower of Babel* prior to his 2008 review, which Dr. McSweeney reviewed in advance (ER 325, 516-518).

In Dr. Demers' 2008 Annual Review, Dr. Austin again accused Dr. Demers of not holding classes, stating "It is of great concern that the two spring semester classes were listed as three credit courses but consistently met for only two 50-minute periods weekly, thereby failing to fulfill the time expectations for instructions" (ER 805). Dr. Demers filed a response to his 2008 annual review protesting Dr. Austin's charge stating: "I never cancelled one class in spring 2008 (with the exception of sick days). The students completed 10-11 online quizzes during the scheduled class time on Fridays" (ER 921-923). As discussed above, the Defendants persisted in refusing to acknowledge that online classes were permissible activities because that would undercut their class cancellation claims.

16

Dr. Demers asked for a meeting with Provost Warwick Bayly to correct the errors in his annual reviews regarding class cancellations. Dr. Demers met with Drs. Bayly, McSweeney and Dr. Strickmeyer in February of 2009 to discuss his 2008 annual review (ER 340-341, 626). During the meeting, Drs. Bayly and McSweeney questioned Dr. Demers about his teaching, specifically criticizing the giving of online quizzes and side-stepped the issue of false class cancellation charges (ER 626). Dr. Bayly did nothing to correct Dr. Demers' review (ER 345-347).

### 4. Drs. Austin and McSweeney Commenced an Internal Audit Investigation of Dr. Demers

In 2007, shortly after Drs. McSweeney and Austin expressed their mutual desire to be rid of Dr. Demers, they requested an internal audit, or investigation, of Dr. Demers from Heather Lopez, the WSU Internal Auditor, because of alleged concerns over Dr. Demers' activities with Marquette Books.[7] This morphed into an investigation of Dr. Demers' alleged class cancellation activities, first discussed in his 2006 annual review. Dr. Austin was the primary source of information for Ms. Lopez' audit (ER 289). Dr. Austin provided Ms. Lopez with a predominantly negative summary of Dr. Demers' service record, stating, for instance, that he

---

[7] Dr. Demers' activities with Marquette Books had been examined by Ms. Lopez' predecessor, Norm Coffin in 2004 and no ethical violations were found, which Ms. Lopez concurred with. (ER 367). Dr. Austin claims she did not "initiate" the audit but the record shows that she was instrumental in causing the audit (ER 531-543).

consistently failed to attend faculty meetings (ER 545-546) – a charge disproven by the actual minutes of faculty meetings produced in discovery (ER 120-195). Interestingly, Dr. Demers was the only member of the Murrow faculty to ever be audited (ER 550-551), and Ms. Lopez said she never conducted a similar investigation for any other faculty member as she did for Dr. Demers (ER 369-370).

Despite the fact that Ms. Lopez claimed she was not charged with investigating performance issues, (ER 372-373) she concluded that Dr. Demers' performance violated academic regulations for the cancellation of classes in 2006 and 2007, even though she had reviewed all syllabi for Dr. Demers' classes, including those for 2007, which showed no classes were cancelled in spring semester 2007 (ER 1019-1027). Ms. Lopez also found that Dr. Demers violated the policy requiring approval for outside extended activities because he did not submit an Annual Report form to his department chair. Dr. Demers protested the factual findings of this internal audit report, to no avail, explaining, once again, that he had not cancelled classes in spring of 2007 and that he had not submitted the Annual Report based upon the advice of Vice Provost Peterson, which he verified (ER 826, 1030-1049). Dr. Demers filed an extended activities report in 2008, and Dr. Lear acknowledged in the meeting in June 2008 that Dr. Demers had complied with university rules.

Dr. Demers later discovered that Ms. Lopez' sister, Dawna Akin, worked as an administrative aid in Dr. Austin's office (ER 201, 321-322, 566-567). Ms. Akin had emailed Dr. Austin that Ms. Lopez was her sister and that she was "very helpful" (ER 830). Dr. Demers wrote Dr. Floyd in October of 2008 claiming that the relationship between Ms. Lopez and Ms. Akin posed the appearance of a conflict of interest that might have adversely affected the independence of the audit investigation. Dr. Demers asked if he could file a conflict-of-interest complaint against Ms. Lopez but Dr. Floyd never responded to that request (ER 569). Thereafter, Dr. Demers wrote State Auditor Brian Sonntag about the possible conflict of interest but his office declined to investigate (ER 832-835). Subsequently, as a result of this litigation, Dr. Demers learned through discovery that Dr. Floyd had written Mr. Sonntag, asking him to look into the potential conflict of interest (ER 837). Ms. Lopez helped write the letter to Mr. Sonntag (ER 378). Mr. Sonntag replied to Dr. Floyd saying that his office concluded that a potential conflict of interest did exist (ER 838). This letter was not provided to Dr. Demers until after he commenced his lawsuit (ER 332, 621). Thereafter, WSU ordered a second audit to be conducted by a University of Idaho auditor Deloris Salesky. Dr. Demers was never informed about this audit and he never talked with Ms. Salesky. Dr. Demers was provided a copy of this second audit in the fall of 2009 (ER 575-580). Dr. Demers continued to point out the repeated errors about

19

class cancellations in both of the audits but WSU never responded or corrected any statements in the audits (ER 581-586).

Dr. Austin used the Lopez audit to justify the letter sent to Dr. Demers on April 16, 2008, via USPS certified/receipt required, to provide Dr. Demers with a "notice concerning serious or repeated neglect of duty" (ER 294. 925-26). The letter claimed that Dr. Demers had violated university rules by giving final exams earlier than final exam week and by cancelling classes, and it threatened possible termination. Dr. Demers responded in writing to the notice, disputing the facts, again to no avail (ER 925-926).

### 5. The Defendants' Conduct Punishes Dr. Demers for the *7-Step Plan* and *The Ivory Tower of Babel*

Dr. McSweeney testified that all it takes is two or three years of bad reviews (below a rating of "3") to force even tenured professors to resign. (ER 470-483). These occurred after Dr. Demers released the *7-Step Plan* and after he proposed, and wrote, *The Ivory Tower of Babel*. The increasingly negative annual reviews provided by Dr. Austin – in stark contrast to the annual reviews that preceded them – provided a path to force Dr. Demers out. Despite repeated requests to correct the annual reviews, the Defendants, in conjunction with Ms. Lopez, perpetuated the falsehood that Dr. Demers had cancelled classes in violation of some unspecified university policy. These poor reviews and the audit purportedly justified the formal notice of discipline, which simply perpetuated, in circular fashion, the

unfounded negative reviews that claimed Dr. Demers wrongfully cancelled class. When the Washington State Auditor concluded the audit was impaired by a potential conflict of interest, Dr. Demers was never told about it. Ms. Lopez' audit was never withdrawn or corrected. Instead, WSU commissioned a second audit which also erroneously concluded that Dr. Demers had cancelled classes but that he conducted no wrongdoing since that time.

## V.    SUMMARY OF ARGUMENT

Dr. Demers spoke as a private citizen on a matter of public concern in the *7-Step Plan*; namely, he sought to improve the quality of journalism education at a college named for a man long-associated with quality journalism – Edward R. Murrow. When the district court concluded that this topic was not a matter of public concern and that Dr. Demers' private speech was made in his "official capacity" as a WSU professor, it committed reversible error.

The district court committed further reversible error when it misconstrued *Garcetti* to apply to Dr. Demers' book, *The Ivory Tower of Babel*. The district court's ruling, if left in place, effectively means that any speech of a university professor does not deserve First Amendment protection.

As explained herein, whether speech is a matter of public concern is a question of law, but whether the speaker acts as a public employee, or a private citizen, is a mixed question of fact and law. The district court recognized this latter

21

standard but failed to apply it. The district court reached its decision by viewing the record in the light most favorable to the defendants, contrary to well-settled law. The district court ignored material issues of fact about whether the *7-Step Plan* was the product of a citizen-publisher or the product of an academic in WSU's employ. The district court accepted the Defendants' argument that the *7-Step Plan* was written as part of Dr. Demers' duties serving on the Murrow structure committee that was studying the feasibility of moving Murrow from the College of Liberal Arts to an independent college status. However, the *7-Step Plan* does <u>not</u> address the issue of structural separation but a different issue – the relationship between Murrow and media professionals and businesses.

The district court's ruling found the *7-Step Plan* to be part of Dr. Demers' job duties because <u>one</u> of its <u>seven</u> steps calls for the separation of the communications and mass communications programs in Murrow, citing an email with no connection to the *7-Step Plan* as support. It found, erroneously, that Dr. Demers wrote the *7-Step Plan* solely to promote the mass communications/communications studies split ("comm. studies/mass comm. split"), that he distributed the *7-Step Plan* internally within Murrow and that he distributed the *7-Step Plan* after "it was not adopted by his fellow members" (ER 7). There is no evidence in the record to support these findings. Rather, the record contradicts them and shows that Dr. Austin knew nothing about the *7-Step Plan*

before it was sent, that it was never presented to the Murrow's structure committee or to Murrow for any adoption.  Dr. Austin <u>disavowed</u> the *7-Step Plan*, claiming it was not officially sanctioned and that it was "just messages, basically" (ER 212).

Thus, <u>if</u> the district court applied a "mixed question of law and fact" analysis to the *7-Step Plan,* it erred by disregarding the disputes of material fact on the scope of Dr. Demers' job duties with respect to the *7-Step Plan*, and that question should have gone to the jury.

The district court's ruling is further complicated because it begs the very question at the heart of this case:  Do university professors have free speech and rights of academic freedom after *Garcetti*?  The district court answered this question in the negative when the Supreme Court has expressly refused to answer it in *Garcetti*.  Because the district court found material issues of act on the three remaining factors to be considered in a First Amendment retaliation case,[8] this brief presents evidence and argument only to establish that Dr. Demers' speech is on a matter of public concern and deserves First Amendment protection.

Only by ruling as it did on the threshold First Amendment questions did the district court find that the defendants were protected by qualified immunity. Because the district court committed reversible errors regarding the First Amendment, its final error regarding qualified immunity should also be set aside.

---

[8] *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) discussed in Sec. VI. B. *infra.*

## VI.   ARGUMENT

## A.   STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed do novo.  *Las Vegas Sands LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).   "Summary judgment is appropriate only when 'there is no genuine issue as to any material fact … and the moving party is entitled to judgment as a matter of law.'"  *Posey v. Lake Pond Oreille Sch. Dist. No. 84,* 546 F.3d 1121, 1126 (9th Cir. 2008) quoting FRCP 56(c).   All evidence must be construed in the light most favorable to Dr. Demers and Dr. Demers must be given the benefit of all reasonable inferences.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Las Vegas Sands*, 632 F.3d at 532.   The grant of summary judgment is inappropriate if there is "any genuine issue of material fact or the district court incorrectly applied the substantive law."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007).

## B.   THE DISTRICT COURT ERRED BY CONCLUDING THE *7-Step Plan* AND *The Ivory Tower of Babel* DID NOT ADDRESS A MATTER OF PUBLIC CONCERN

"The First Amendment shields a public employee if he speaks as a citizen on a matter of public concern."  *Huppert v. City of Pittsburgh*, 574 F.3d 696, 702 (9th Cir. 2009).  "It is well settled that the state may not abuse its position as employer to stifle "the First Amendment rights [its employees] would otherwise enjoy as

citizens to comment on matters of public interest." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009), cert.denied, 130 U.S. 1047 (2010) (quoting *Pickering v. Bd. of Edu.*, 391 U.S. 563, 568 (1968)). The Ninth Circuit uses a five-step inquiry to determine whether a public employee has alleged a violation of his First Amendment rights as a result of government retaliation for his speech:

> (1) Whether the plaintiff spoke on a matter of public concern;
>
> (2) Whether the plaintiff spoke as a private citizen or public employee;
>
> (3) Whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action;
>
> (4) Whether the state had an adequate justification for treating the employee differently from other members of the general public;
>
> (5) Whether the state would have taken adverse employment action even absent the protected speech.

*Eng*, 552 F.3d at 1070-1072.

The district court granted summary judgment on steps 1 and 2, finding that questions of material fact exist regarding the remaining three steps.

## 1.   The District Court Erred by Finding the *7-Step Plan* Did Not Address a Matter of Public Concern

The public concern inquiry is purely a question of law, which this court reviews de novo. *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006).

"Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social or other concern to the community'"

*Johnson v. Multnomah Cnty. Or.,* 48 F.3d 420, 422, cert.denied, 515 U.S. 1161 (1995)(quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983). "[S]peech that deals with individualized personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." *Eng,* 552 F.3d at 1070.

The Ninth Circuit has "defined the scope of the public concern element …broadly and adopted a 'liberal construction of what an issue of 'public concern' is under the First Amendment." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709-10 (9th Cir. 2009).

The Ninth Circuit, citing *Ulrich v. City and County of S.F.*, 109 F.3d 578, 586 (9th Cir. 1997), has specifically rejected "rigid multi-part tests" and refused to articulate "a precise definition of public concern" stating:

> "Rather, we rely on the framework set forth in *Connick v. Myers,* which reviews the '*content*, *form* and *context* of a given statement, as revealed by the whole record.' On the basis of this 'generalized analysis of the nature of the speech,' we can place the speech on a continuum ranging from matters of public to matters of purely private concern." On one end, there is speech that relates to matters of concern to the community, including political or social matters. On the other end, there are individual grievances and personnel disputes that are irrelevant to the public's evaluation of governmental agencies.

*Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1103 (9th Cir. 2011) (citations omitted).

The district court took an unduly restrictive view of what establishes a matter of public concern, finding public concern only in matters "dealing with

possible corruption or a misuse of public funds" or to the "public's evaluation of the performance of governmental agencies." It found that the *7-Step Plan* was not of public concern because it did not address those issues, but only raised issues "internal" to Murrow.

This finding is factually and legally incorrect. The *7-Step Plan* did not deal only with a proposed comm. studies/mass comm. split, which is how the district court characterized it (ER 7). The plan deals with an entirely different topic, as stated in the cover letter (ER 697):

> "Its purpose is to show why the School, unlike other mass communications programs has failed to generate significant support and donations from mass media professionals and businesses (i.e. those associated with the production of television and radio programming, newspaper content, and public relations and advertising messages) **AND** how this problem can be corrected."

The *7-Step Plan* has all the hallmarks of speech of public concern. It addresses funding for a publicly funded school and it discusses practices that impact Murrow students (i.e. lack of accreditation and faculty from the professional world). The *7-Step Plan* provides citizens with information from which they can assess Murrow's performance (by highlighting perceived program weaknesses). The plan focuses on improving the quality of Washington's only comprehensive publicly funded journalism school. The *7-Step Plan* identifies a specific problem – the alienation of the professional media community – and proposes solutions to address it, some of which involve funding.

The Supreme Court has said that funding of public schools "is a matter of legitimate concern … free and open debate is vital to informed decision-making by the electorate." *Pickering v. Bd. of Edu.*, 391 U.S. 563, 571-72 (1968). Furthermore, multiple cases have found speech that touches on the "quality of public education…is…a matter of public concern." *Kelly v. Huntington Union Fee School*, 675 F.Supp.2d 283, 294 (E.D.N.Y. 2009) (citing *Bernheim v. Litt,* 79 F.3d 318, 325 (2d Cir. 1996); *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1206 (10th Cir. 2007) (whether public charter school's charter might not be reviewed); *Evans-Marshall v. Bd. of Educ.* of *The Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 231 (6th Cir. 2005) (themes in books used in public schools); *Sadid v. Idaho State University*, 265 P.3d 1144, 1152 (Idaho 2011)("issue of creating a medical school at Idaho State University was a matter of public concern.").

The Tenth Circuit has explained:

"Generally, speech by a public school employee about a policy or practice which can substantially and detrimentally affect the welfare of the children attending the school constitutes speech on a matter of public concern. *See Johnsen v. Independent School Dist. No. 3,* 891 F.2d 1485, 1490 (10th Cir.1989); *Rankin v. Independent School Dist. No. I-3,* 876 F.2d 838, 843 (10th Cir.1989)*; Leuthje v. Peavine School Dist.,* 872 F.2d 352, 355 (10th Cir.1989)."* Quoting from *Morfin v. Albuquerque Pub.Sch.,* 906 F.2d 1434, 1438 (N.M. 1990).

This Court has acknowledged that teachers who speak out about matters impacting students address matters of public concern:

28

> Teachers are uniquely situated to know whether students are receiving the type of attention and education that they deserve and, in this case, are federally entitled to. We have long recognized "the importance of allowing teachers to speak out on school matters," *Connick v. Myers,* 461 U.S. 138, 162, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), because "'[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions'" on such matters, *id.* (quoting *Pickering,* 391 U.S. at 572, 88 S.Ct. 1731).

*Settlegood v. Portland Pub. Sch.*, 371 F.3d 503, 514, cert.denied, 543 U.S. 979 (2004).

Dr. Demers' speech in the *7-Step Plan* reflects an informed and definite opinion on problems impacting the quality of education that Murrow students receive, and it proposes solutions.

Proof that the quality of the Murrow School is a matter of public concern also comes from the public report that recommended the conversion of the Murrow School to the Murrow College (ER 706-768). This report discusses the need to provide a quality education to the 1,400 majors in the school (ER 714) and steps to do it. That Dr. Demers' *7-Step Plan* was not adopted does not detract from the same public concern discussed in the Murrow School/College report – improving the quality of journalism education for Murrow students. Further, WSU itself invokes public inquiry and debate about Murrow and its "quality education." For

instance, it releases press releases touting Murrow as "among the nation's top 25 journalism schools."[9]

The district court also ignored evidence that demonstrates that the quality of journalism education – as a fact – is an issue subject to much current public debate (ER 635-695), and is covered in the press and in blogs.[10]

Dr. Demers' *7-Step Plan* was not related to "internal matters"[11] at WSU but addressed the larger issue of the overall quality of the journalism education at WSU – funded by taxpayer dollars, and the source of future journalists who need top-notch training to keep citizens informed, and democracy functioning.

The district court also failed to consider the <u>absence</u> of indicators of "<u>private</u> concern" identified by this Court.[12] For instance, the subject matter of the *7-Step*

_____

[9] https://news.wsu.edu/pages/publications.asp?Action=Detail&PublicationID=29905&TypeI...

[10] "While not dispositive of whether speech relates to a matter of public concern, the fact that the press takes interest in the matter is relevant to the determination." *Spiegla v. Hull,* 371 F.3d 928, 936 (7th Cir. 2004). In *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004), the Supreme Court said that "public concern is something that is a subject of legitimate news interest …"

[11] Even if the *7-Step Plan* did relate to "internal matters" within Murrow that does not mean they are not of public concern. In *Anthoine v. North Central Counties Consortium*, 605 F.3d 740, 749-50 (9th Cir. 2010) the speech at issue involved privately communicated speech about an internal failure within the agency. The court found this of "public concern."

[12] *See Desrochers,* 572 F.3d at 710.

*Plan* did not discuss an individualized grievance and did not present a grudge or other private interest. Dr. Demers sought no personal gain from the *7-Step Plan*. Indeed, he offered his own money to fund the improvements discussed in the *7-Step Plan.* (An offer of a large, private gift to a public university of $100,000 surely is something the taxpaying public wants to know about.) Dr. Demers publicly and widely circulated the *7-Step Plan* outside of the Murrow College to get public attention. In addition, the context in which Dr. Demers presented the *7-Step Plan* is not one of an internal power struggle or a personal employment grievance because Dr. Demers sent the *7-Step Plan* to Dr. Bates before he received his 2006 annual review from Dr. Austin, and before he had issues with Dr. Austin.

Finally, as discussed in Sec. VI. C., the *7-Step Plan* was not produced as part of his official duties as a professor but was produced by Dr. Demers as a well-intentioned, citizen-publisher seeking to improve the quality of a major public institution – the Murrow College. Along the continuum discussed in *Desrochers* the *7-Step Plan* falls well within the range of public concern.

## 2. The District Court Erred by Finding That *The Ivory Tower of Babel* Did Not Address a Matter of Public Concern

The district court's ruling contains no analysis as to whether the *The Ivory Tower of Babel* addresses a matter of public concern and it disregards the discussion of it in Dr. Demers Declaration (ER 625) and in the record (921, 941, 1007). The simplistic ruling demonstrates the difficulty of applying the *Garcetti*

public employee speech limitation to academic speech, which has historically been protected by concepts of "academic freedom", and issues of "public concern" are irrelevant.

According to Dr. Demers, the *Ivory Tower of Babel* book would examine why the social sciences and universities as a whole fail to live up to the ideals of the Enlightenment philosophers who stressed the importance of democracy, due process, freedom of speech and the press, and individual rights. In his proposal for his sabbatical to write the book, he explained that "[T]he book examines the role and function of social science research in society.....The book asserts that the social sciences have failed to live up to their promises and employs historical, comparative, personal and social scientific methods to support this conclusion." (ER 941). *The Ivory Tower of Babel* is a work of academic scholarship that has historically been regarded as protected by the concept of academic freedom that is "of transcendent value to all of us." *Keyshian v. Bd. of Regents of the Univ. of N.Y.*, 385 U.S. 589, 603 (1967). The concept of academic freedom recognizes a professor's unique role in the advancement of human knowledge through speech, which is of value to society as a whole. *Id.* Therefore, a scholarly work like *The Ivory Tower of Babel* is *per se* a matter of public concern because it advances human knowledge. Further, it addresses a matter of public concern because it

discusses social issues of concern to the community (i.e. does social science research have any real impact on society?).

*The Ivory Tower of Babel* clearly qualifies as speech that deals with a matter "of political, social or other concern to the community" and it deserves First Amendment protection. *See Desrochers*, 572 F.3d at 710 n.4; *Adams v. The Trustees of the Univ. of N.C.*, 640 F.3d 550, 565 (4th Cir. 2011).[13]

## C. THE DISTRICT COURT ERRED IN FINDING THAT THE *7-Step Plan* AND *The Ivory Tower of Babel* WAS UNPROTECTED EMPLOYEE SPEECH

### 1. Even Under *Garcetti* the *7-Step Plan* Does not Qualify as "Official Duties" Speech

In *Garcetti* the Supreme Court provided some guidance, but not a "comprehensive framework," for determining when public employees make statements pursuant to "official duties" because the petitioner admitted that his speech was made pursuant to his employment duties. 547 U.S. at 424. Speech becomes part of an "official duty" when it

- "owes its existence to a public employee's professional responsibilities";

- is "commissioned or created" by the employer;

---

[13] The description in the record of *The Ivory Tower of Babel* and the context in which it was written – as an academic scholarly work to be published as a publicly available book – clearly was sufficient for the district court to make a determination of "public concern" (ER 625, 941, 1007).

- "[is] part of what [the employee] was employed to do";

- is a task the employee "was paid to perform"; and

- "ha[s] no relevant analogue to speech by citizens."

547 U.S. at 421-42.

None of these factors fit the *7-Step Plan*. It was not commissioned by WSU (ER 204-212, 609-612). Dr. Austin did not even know Dr. Demers had written it until he distributed it publicly (ER 205). He was not paid to do it – particularly because he offered to pledge his own money in support of it (ER 609-612). The *7-Step Plan* also has a relevant analogue to citizen speech. Many public institutions get (and usually accept) pledges from private supporters who wish to express their views in support of the accomplishment of some mission by a monetary contribution.[14] The act of pledging, in and of itself, constitutes speech in support of the subject of the pledge.

Finally, as discussed below, the *7-Step Plan* simply is not part of what Dr. Demers was employed to do.

2. **The District Court Erred by Applying *Garcetti* to the *7-Step Plan*; by Deferring to the Defendants' Definition as to the Scope and Content of Dr. Demers' Job Responsibilities and by Ignoring**

---

[14] *See,* e.g., *Gates Foundation to Give Seattle Schools $7.2M* at http://www.bizjournals.com/seattle/stories/2009/03/09daily24.html.

### Evidence that Showed that the *7-Step Plan* was Not Part of Dr. Demers' "Official Duties"

In *Posey v. Lake Pond Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008), this court held that "whether the speech in question was spoken as a public employee or a private citizen presents a mixed question of fact and law." It reversed the district court's grant of summary judgment in favor of the school district that had concluded – purely as a matter of law – that the speech in question had been spoken pursuant to Posey's job responsibilities. Posey worked as a "security specialist" at Sand Point High School and he wrote a letter to the district's chief administrative officer to communicate concerns over the school's safety and emergency policies. In reversing the lower court, this court found that "the task of determining the scope of plaintiff's job responsibilities is concrete and practical rather than abstract and formal." *Id.* at 1129. The court concluded:

> "[B]ut when there are genuine and material disputes as to the scope and content of the plaintiff's job responsibilities, the court must reserve judgment on this third prong of the protected status inquiry until after the fact-finding process" *Id.* at 1131.

*See also Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009), cert.denied, 130 S.Ct. 1047 (2010). *Huppert v. City of Pittsburg*, 574, 696, 718 (9th Cir. 2009).

The district court disregarded *Posey* and *Robinson* in the face of substantial record evidence that the *7-Step Plan* was <u>not</u> part of Dr. Demers' official duties as a WSU faculty member. At the very least, if the court found that Defendants'

35

evidence contradicted Dr. Demers' evidence, the "official duties" question should have been reserved for the fact finder.

The district court should have viewed the record in the light most favorable to Dr. Demers. *Nichols v. Dancer*, 657 F.3d 929, 934 (9th Cir. 2011); *Robinson,* 566 F.3d at 821. Instead, the court accepted the Defendants' claim that Dr. Demers developed the *7-Step Plan* as part of his responsibilities in serving on a committee that was examining converting the Murrow School to an independent college.

To the extent the district court construed too narrowly the prong of "public concern" it construed the "official duties" prong too broadly. The district court broadly construed Dr. Demers' duties as a faculty member to "participate in a wide range of academic, administrative and personnel functions" to include writing the *7-Step Plan,* despite strong evidence to the contrary. This district court's finding is like the argument made by the university in *Adams v. Trs. of the Univ. of N.C. Wilmington*, 640 F.3d 550 (4th Cir. 2011) that off-campus speech by Dr. Adams was part of his general responsibilities to engage in general "scholarship, research, and service to the community." *Id.* at 555, 564. The Fourth Circuit rejected this argument:

> "Put simply, Adams' speech was not tied to any more specific or direct employee duty than the general concept that professors will engage in writing, public appearances, and service within their respective fields. For all the reasons discussed above, that thin thread

36

is insufficient to render Adams' speech 'pursuant to [his] official duties' as intended by *Garcetti*. *Id.* at 569."

*Adams*, 640 F.3d at 569.

*Adams* stands for the proposition that off-campus speech made by a faculty member is protected under the First Amendment and exempt from *Garcetti*. *Adams* cogently illustrates the wisdom of this exemption because otherwise <u>any</u> speech made by a faculty member could be deemed "a statement made pursuant to [his] official duties" because professors are hired to undertake speech through scholarship, research, teaching and services. 640 F.3d at 564. The Fourth Circuit wisely recognized that application of *Garcetti's* "official duties" test simply does not fit in an academic setting.

> "Applying *Garcetti* to the academic work of a public university faculty member under the facts of this case could place beyond the reach of First Amendment protection many forms of public speech or service a professor engages in during his employment. That would not appear to be what *Garcetti* intended, nor is it consistent with our longstanding recognition that no individual loses his ability to speak as a private citizen by virtue of public employment. In light of the above factors, we will not apply *Garcetti* to the circumstances of this case."

640 F.3d at 564.

*Adams* also held that Dr. Adams' inclusion of off-campus speech for consideration in Dr. Adams' application for promotion to full professor was not evidence that such speech was part of Dr. Adams' "official duties." So, too, in this case, Dr. Demers' inclusion of the *7-Step Plan* in his 2007 Annual Review does

37

not prove that it was part of his "official duties." Both Dr. Adams' and Dr. Demers' speech constituted protected citizen speech when made, that was not stripped of First Amendment protection by virtue of "factors that came into play only after the protected speech was made." *Id*. at 561.

Here, the district court swept even more broadly and indiscriminately than in *Adams* by first misapprehending the true content of the *7-Step Plan* (i.e. limiting it to a proposed comm. studies/mass comm. split) and second, including the *7-Step Plan* in a broad net of generalized professional duties. Under the district court's reasoning, virtually anything a professor says could fall within that net.

The problem of overbreadth is a key reason why the Supreme Court exempted academic speech from the "official duties" test in *Garcetti*. Justice Souter in his dissent pointed out:

> "This ostensible domain beyond the pale of the First Amendment is spacious enough to include even the teaching of a public university professor, and I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write "pursuant to ... official duties." *See Grutter v. Bollinger*, 539 U.S. 306, 329 (2003).

547 U.S. at 439.

The majority responded:

> "There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that

38

reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching."
*Id.* at 425.

Thus, there was no reason for the district court to apply *Garcetti* to Dr. Demers' speech in this case.[15] Both the *7-Step Plan* and *The Ivory Tower of Babel* deserved First Amendment protection <u>even if</u> both were viewed as related to Dr. Demers' work for WSU.

However, in addition to the foregoing legal error, the district court disregarded facts in the record that show that Dr. Demers acted as a private citizen in preparing and distributing the *7-Step Plan*:

- Dr. Demers signed the *7-Step Plan* <u>in his capacity as publisher, Marquette Publisher, LLC</u> (ER 697, 701).

- Both iterations of the *7-Step Plan* included a significant pledge amount by Dr. Demers (ER 697, 701).

- The purpose of the *7-Step Plan* was not to recommend or even discuss transforming the Murrow School into an independent college or to propose the comm. studies/mass comm. split, as the district court found by disregarding the actual language of the plan (ER 697-701).

---

[15] Just because Dr. Demers' speech concerned the subject matter of his employment is not dispositive as the "First Amendment protects some expressions related to the speaker's job." *Garcetti,* 547 U.S. at 421.

- There is no evidence that anyone within Murrow or WSU asked Dr. Demers to prepare the *7-Step Plan* on its **real** topic which was the problematic relationship between the Murrow College and the professional media community and solutions that would improve the quality of journalism education at Murrow. As evidenced by the administration's response, Dr. Demers came up with the *7-Step Plan* on his own (ER 204-212, 461).

- Dr. Demers sent the *7-Step Plan* outside of his chain of command.[16] Indeed, Dr. Austin did not know about it before he sent it to Dr. Bates (ER 204-212, 461).

- Dr. Austin did not direct Dr. Demers to prepare the *7-Step Plan* (ER 204-212).

- Dr. Demers did not use any university resources in connection with the *7-Step Plan* (ER 610).

- Dr. Austin testified that she had no knowledge that Dr. Demers had developed the *7-Step Plan* until Dr. Lear brought it to her attention (ER 204-205).

- The *7-Step Plan* was never submitted to Murrow for formal consideration (ER 207, 611).

- A purported report that Dr. Demers did work on was not the *7-Step Plan*, which was never submitted to the committee (ER 208).

---

[16] This is an indication of acting outside of "official duties." *Freitag v. Ayers*, 468 F.3d 528, 546 (9th Cir. 2006).

- Dr. Austin clearly did not view the *7-Step Plan* as anything associated with Murrow and disavowed it when questioned about it characterizing it as "it's just messages, basically" (ER 212).

Finally, the very fact that Dr. Demers pledged his own money is strong evidence that he was "putting his money where his mouth was" as a citizen advocate and not as a college professor. It is inconceivable that a gratuitous $50,000/$100,000 pledge of personal funds from a faculty member would be within that member's "official job duties."

The district court's analysis reflected an untoward deference to the institutional decisions of the WSU Defendants, relying upon cases that did not address the issue of individual faculty protection under the First Amendment, as opposed to institutional protection. This case is not an employment case governed by statutory or case law, but a constitutional case that raises serious First Amendment questions that should not be decided by deference to the institution.

> [f]ederal courts … have never been hesitant to intervene on constitutional grounds in the hiring, discharge or promotion of public employees, including academic personnel, where the asserted claim is that the action taken was intended to penalize … the exercise of First Amendment rights.

*Clark v. Whiting*, 607 F.2d 634, 638-39 (4th Cir. 1979).

Employment-based decisions made to retaliate for protected speech enjoy no special deference. For instance, a university may not deny tenure to a professor in

retaliation for the exercise of First Amendment rights. In *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 597-98 (2d Cir. 1990), cert.denied, 501 U.S. 1211 (1991). The court said:

> "Thus, while we recognize that courts should accord deference to academic decisions … for decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that casts a pall of orthodoxy' over the free exchange of ideas in the classroom" (*Id.* citations omitted).

The district court erroneously relied upon *Hong v. Grant*, 516 F.Supp.2d 1158, 1166 (C.D. Cal. 2007). However, the speech at issue in *Hong* is not remotely comparable to Dr. Demers' speech in either content or context. *Hong* involved four statements made by a university professor, two of which he admitted he made as part of his faculty responsibilities. The statements related to faculty reviews and specific departmental staffing decisions. Dr. Hong never said that he was speaking in a capacity other than as a university professor, unlike Dr. Demers who identified himself as the publisher of Marquette Books in releasing the *7-Step Plan*. Hong's speech was characterized as "internal administrative disputes" and all of his statements were made internally within his department or within university administrative circles.

In contrast, Dr. Demers' *7-Step Plan* was distributed outside of his chain of command and it does not discuss specific personalities or specific disputes. Rather, it presents a conceptual proposal about the need for changing the direction

42

of the Murrow College from the standpoint of a former journalist/publisher/professor.

Furthermore, as explained in the next section, the lower court's ruling if upheld in this circuit, taken to its logical conclusion would signal the end of free speech and academic freedom for university professors.

## D. THE DISTRICT COURT ERRED BY CONCLUDING THAT *The Ivory Tower of Babel* WAS UNPROTECTED SPEECH

The lower court found that *The Ivory Tower of Babel* was not protected speech because it was "made in the course of plaintiff's employment as a college professor." (ER 8). This conclusion stems from a misreading of *Garcetti* which did <u>not</u> find that <u>all</u> public employees making statements pursuant to their official duties deserve no First Amendment protection. Rather, the Supreme Court stated that it was not deciding whether its holding was applicable to "speech related to scholarship or teaching." *Garcetti,* 547 U.S. at 425. It did so to address Justice Souter's concern that the majority holding conflicted with academic freedom because academic personnel lecture and produce scholarly work – activities long thought to be protected by academic freedom – in accordance with their "official duties."

According to the district court, however, any book written by a university professor in the course of employment as a college professor is unprotected speech. If the writings of university professors are without First Amendment protection,

public universities will have unbridled discretion to penalize professors based on their viewpoint. Professors will be constrained from playing the critical role they play in our democratic system through controversial examination and inquiry, if they face potential adverse consequences. As the United States Supreme Court said in *Sweezy v. State of N.H.*, 354 U.S. 234, 240 (1957):

> Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die.

In *Grutter v. Bollinger,* 539 U.S. 306, 329 (2003) the Supreme Court said:

> "We have long recognized that given the important purpose of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."

In sum, it is imperative that university professors like Dr. Demers receive First Amendment protection for their teaching and scholarship, which by their very nature are part of their "official duties" and universities may not take adverse actions that infringe upon this precious, necessary protection.

## E. THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The district court's decision should be reversed and remanded for trial on Dr. Demers' claims because it erred as a matter of law and fact by concluding that Dr. Demers' speech was not of "public concern" and by applying *Garcetti* to Dr. Demers' speech under the facts of this case. The district court erroneously relied

upon this court's narrow affirmance of *Hong v. Grant*[17] to conclude the defendants were entitled to qualified immunity. This court did not review Dr. Hong's First Amendment claims, but only found that it was not clearly established that there was a First Amendment right to comment on "faculty administrative matters."

This case does not involve such matters, but involves instances of protected speech as discussed above. Therefore, *Hong v. Grant* does not apply. Instead, as the Fourth Circuit noted in *Adams* "[T]he underlying right Adams asserts the defendants violated – that of a public employee to speak as a citizen on matters of public concern – is clearly established and something a reasonable person in the defendants' position should have known was protected." 640 F.3d at 566. *Accord, Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009); *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011).

Dr. Demers also asserts that his right to speak as a citizen on matters of public concern is a right that the Defendants know as a well-established right. None of the Defendants, as WSU administrators, can deny knowledge of the WSU policy that embodies the legal rights that Dr. Demers possesses, and that were violated. [This is particularly true for Dr. Austin, who as Interim Director of Murrow has to have had training in, and knowledge of, the First Amendment.]

---

[17] *Hong v. Grant*, 403 Fed.Appx. 236, 237 (9th Cir. 2010). It is unpublished and not precedent under Circuit Rule 36-3(a).

45

Indeed, the WSU Faculty Manual requires them to protect the "free inquiry and public understanding of academic freedoms" (ER 84).

The free speech rights established by the First Amendment have been incorporated in the WSU Faculty Manual that states:

> 1.    Preamble.
>
> Washington State University has a long history of commitment to the principle of academic freedom for faculty and students. Freedom of expression is recognized as one of the essential elements of academic freedom …
>
> 2.    Policy.
>
> It is the policy of Washington State University to support and promote the rights of all individuals to express their views and opinions for or against actions or ideas in which they have an interest, to associate freely with others, and to assemble peacefully. The faculty has the right to dissent and protest.[18]

(ER 74).

In sum, given WSU's clearly expressed policy that embodies First Amendment protections, the Defendants cannot claim they did not know that Dr. Demers had a well-established right to speak without retaliation for his speech. Accordingly, the Defendants are not entitled to qualified immunity.[19]

---

[18] Dr. Lear expressly acknowledged this policy (ER 96-97). The WSU Faculty Manual is what faculty members look at first to understand their rights and responsibilities (ER 339).

[19] There is no question that Dr. Demers has alleged and has shown facts that establish a constitutional violation, satisfying the first steps in the sequence for resolving qualified immunity claims. The second step looks at whether the

## VII.   CONCLUSION

The district court's decision should be reversed and the case remanded for trial on Dr. Demers' claims, because it erred as a matter of law and fact by concluding that Dr. Demers' speech was not of "public concern" and by applying *Garcetti* to Dr. Demers' speech under the facts of this case.

Dated:  February 7, 2012                    Respectfully submitted,

                                            /s/ Judith A. Endejan
                                            Judith A. Endejan
                                            GRAHAM & DUNN PC
                                            2801 Alaskan Way ~ Suite 300
                                            Seattle, WA 98121-1128
                                            Tel:  (206) 624-8300
                                            Fax:  (206) 340-9599

                                            *Attorneys for Plaintiff-Appellant*
                                            *David K. Demers*

---

plaintiff's constitutional right was "clearly established" at the time of violation. *Pearson v. Callahan*, 555 U.S. 223 (2009).

47

## STATEMENT OF RELATED CASES

Appellant is aware of no case currently pending before this Court that may be deemed a related case under Ninth Circuit Rule 28-2.6.

## CERTIFICATE OF COMPLIANCE

The foregoing brief of Plaintiff-Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,165 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 word processing software, in 14-point Times New Roman font.

/s/ Judith A. Endejan
Judith A. Endejan

*Counsel for Plaintiff – Appellant*
*David K. Demers*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 7, 2012.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


/s/ Judith A. Endejan
Judith A. Endejan